**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| Lynford Grogg, | ) | Case No. 1:07CV0222 |
| Plaintiff, | ) | Judge William C. Lee |
| v. | ) | Magistrate Judge Roger B. Cosbey |
| CSX Transportation, Inc., | ) | ***DEFENDANT'S MEMORANDUM IN*** |
| | ) | ***SUPPORT OF ITS MOTION FOR*** |
| Defendant. | ) | ***SUMMARY JUDGMENT*** |
| | ) | |

\* \* \*

Defendant, CSX Transportation, Inc., ("CSXT"), has moved for summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff claims two injuries. First, he claims that he developed degenerative disc disease from riding "defective locomotives" in violation of the Locomotive Inspection Act over "defective track" throughout his career at the railroad. Second, he claims that he developed osteoarthritis of the right knee from walking on "large, oversized ballast" throughout his career. CSXT is entitled to summary judgment because: (1) there is no evidence of defective locomotives or defective track in this case, other than Plaintiff's speculation; (2) Plaintiff's claims are precluded by superseding federal law; and (3) there is no evidence of causation.

The position of CSXT is more completely set forth herein.[1]

---

[1] CSXT's motion is based upon the evidence it has as of this date. CSXT moved for extensions of its deadline to file this motion in order to depose Plaintiff's expert, Tyler Kress. To date, despite conducting a site inspection in March 2009, Kress has failed to produce a report of his opinions and therefore has not yet been deposed. CSXT would be prejudiced should his opinions be considered in opposition to summary judgment.

## *STATEMENT OF FACTS*

Plaintiff began his railroad career as a clerk in 1968.  Other than a few summers in the 1970's, Plaintiff spent his career from 1969 until 2007 working as a road conductor, meaning he rode trains over the railroad rather than working inside a railroad yard.  The last fifteen years of his career were split working on either the Chicago super-pool or the Lima pool.  (Grogg Dep. at 54.)   The Chicago super-pool was a priority train that traveled between Willard, Ohio, and Chicago without any stops in between.  The job was generally "step on step off" of the train, with  two days on then two days off.  (Grogg Dep. at 38.)  Plaintiff worked this job most of the year because of the time off of work.   During the winter months, Plaintiff worked the Lima pool. The Lima pool was 93 miles by rail, "Garrett to Lima, and then you usually hop in a cab and come home, or take a cab down and get on a train and come back."   The majority of Plaintiff's time was spent in a locomotive rather walking.  (Grogg Dep. at 56-57.)  He last worked on October 31, 2007.

In 2006, while still working, Plaintiff was diagnosed with "mild degenerative disc disease at L3-, L4-5, and L5-S1" by Dr. Robert Shugart.   Plaintiff underwent physical therapy and had a few injections, but no longer takes pain medication or undergoes any other treatment.    Dr. Shugart has no opinion regarding the cause of Plaintiff's back condition and placed no restrictions on Plaintiff's work capability.

In 2007, Dr. Sassmannshausen diagnosed Plaintiff with osteoarthritis of the right knee  In November 2007, Plaintiff has his right knee replaced.  He briefly returned to work and was later restricted from working as a conductor by Dr. Sassmannshausen.  Dr. Sassmannshausen did not form any opinions regarding causation during his treatment of Plaintiff but believes a prior motorcycle accident and "repetitive" work activities "contributed" to the condition. (Sassmannshausen Dep. at 43.)  He defines "repetitive" work as getting on and off trains, not

2

walking on "large, oversized ballast" as alleged by Plaintiff.  He defines "contributed" as meaning "a potential source."

Plaintiff is eligible for full retirement when he turns 60 years old on January 1, 2010.

## ANALYSIS

### I.  NO ISSUES OF MATERIAL FACT REGARDING ALLEGED NEGLIGENCE

#### A. Plaintiff cannot produce specific facts to support his FELA claim regarding "defective locomotives"

The FELA, 45 U.S.C. §51 et seq., is a negligence statute. It provides in pertinent part: "Every common carrier by railroad while engaging in [interstate] commerce . . . shall be liable to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the [carrier's] negligence ***." The FELA is not a workers' compensation scheme that provides relief without regard to fault. *Norfolk Southern Ry. Co. v. Sorrell*, 127 S.Ct. 799, 805 (2007).   The mere occurrence of an injury does not constitute negligence. *Chicago, R.I. & P.R. Co., v Lint* (8th Cir. 1954), 217 F.2d. 279, 281 (stating "it has uniformly been held that liability arises from negligence not from injury.")  "To prevail on a FELA claim, a plaintiff must 'prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation.'" *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir.1990) (internal quotation omitted). Consistent with Fed. R. Civ. P. 56, liability under the statute must be based upon substantial evidence in the record. *Gonet v. Chicago and North Western Transp. Co.*, 552 N.E.2d 1224, 1230 (1990).

In this case, with respect to Plaintiff's allegation that he was injured as a result of defective locomotives and defective locomotive seats, there is an absence of the specific facts and evidence necessary for Plaintiff's claim to proceed.  Plaintiff cannot identify why or how the locomotives were allegedly defective.  There is no evidence whatsoever, other than Plaintiff's

speculation, that any locomotive on which he rode was defective. Rule 56 requires the Plaintiff to set forth specific facts to create an issue of material fact for trial. Instead, Plaintiff is relying upon mere allegations that cannot be proven. Accordingly, CSXT is entitled to summary judgment with respect to Plaintiff's allegation of defective locomotives.

### B. Plaintiff cannot produce any evidence to support his allegation that he used locomotives that violated the Locomotive Inspection Act

Plaintiff alleges that locomotives he used were in violation of the Locomotive Inspection Act, 49 U.S.C. §§20701-20703. Such a violation is negligence *per se* under the FELA. *Lilly v. Grand Trunk R. Co.*, 317 U.S. 481, 485 (1943). In enacting the LIA, "Congress recognized that the operation of a locomotive, no matter how it is equipped, involves some danger to life and limb. *Gregory v. Missouri Pac. R.R. Co.*, 32 F.3d 160, 165 (5th Cir.1994). Accordingly, the Act does not address all perils associated with operating locomotives, only unnecessary ones. *Id.*" *Danko v. Union Pacific Railroad Co.*, 2007 WL 1854059, *5 (N.D. Tex. 2007).

There are two ways in which a railroad company can violate the LIA: (1) "A rail carrier may breach the broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary peril to life or limb, in violation of [49 U.S.C. §20701]" *Coffey v. Northeast Illinois Regional Commuter R.R. Corp.*, 2006 WL 951964, 3 (N.D. Ill. 2006); or (2) "a rail carrier may fail to comply with the regulations issued by the Federal Railroad Administration." *Id.* "However, 'this does not mean that the LIA demands that liability ensue in every case in which a plaintiff alleges that a carrier's failure to install some piece of equipment on a locomotive rendered the locomotive unsafe.'" *Id.*

With respect to the first way, there is no evidence that Plaintiff used any locomotive that had "parts and appurtenances" that were not in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb. Plaintiff generally alleges that

some of the locomotives and locomotive seats he utilized throughout his career were "defective," but Plaintiff cannot set forth any specific facts identifying any parts and appurtenances that were not in proper condition or unsafe.  There is no evidence whatsoever that any locomotive used by plaintiff had parts and appurtenances that placed Plaintiff in "unnecessary peril to life or limb." Instead, Plaintiff simply speculates that suspensions or shocks might have been worn on some of the locomotives, although he admits that he has no knowledge of what causes some locomotives to ride differently than others.  (Grogg Dep. at 104, 119-121.)  Without these necessary facts, Plaintiff cannot support his allegations as required by Rule 56.

As to the second way, Plaintiff contends CSXT required Plaintiff to use locomotives that were in violation of various federal regulations promulgated under the LIA, but, as set forth below, there is no evidence of any such violations.

### 1. *Plaintiff cannot produce any evidence that he rode locomotives that had not been periodically inspected as required by 49 C.F.R. §229.23*

Plaintiff contends CSXT violated 49 C.F.R.. §229.23, which provides that locomotives shall be inspected periodically and "the interval between any two periodic inspections may not exceed 92 days." Plaintiff has no evidence to support this contention. Plaintiff cannot produce any evidence of CSXT failing to inspect any locomotives used by Plaintiff.  Because Plaintiff cannot produce any evidence to support his allegation, CSXT is entitled to summary judgment.

### 2. *Plaintiff cannot produce any evidence that he rode locomotives that were in violation of 49 C.F.R. §229.63*

Plaintiff contends CSXT violated 49 C.F.R. §229.63, which provides as follows:

(a) Except as provided in paragraph (b), the total uncontrolled lateral motion between the hubs of the wheels and boxes, between boxes and pedestals or both, on any pair of wheels may not exceed

5

> 1 inch on non-powered axles and friction bearing powered axles, or 3/4 inch on all other powered axles.
>
> (b) The total uncontrolled lateral motion may not exceed 1 1/4 inches on the center axle of three-axle trucks.

49 C.F.R. §229.63.

Plaintiff has no evidence to support this allegation. Plaintiff cannot produce any evidence that he was required to use any locomotive that had "uncontrolled lateral motion" in excess of the limits prescribed by the regulation.  Because Plaintiff cannot produce any evidence to support his allegation, CSXT is entitled to summary judgment.

### 3. Plaintiff cannot produce any evidence that he rode locomotives that were non-complying and moved in violation of 49 C.F.R. §229.9

Locomotives that have "one or more conditions not in compliance" with section 229 of the C.F.R., may be moved only when a "qualified person" determines that it is "safe to move the locomotive" and the railroad has complied with the "maximum speed and other restrictions necessary for safely conducting the movement. 49 C.F.R. §229.9(a). As with Plaintiff's other claims, there is no evidence that any of the locomotives used by Plaintiff had conditions not in compliance with any part of section 229. The only specific condition in section 229 Plaintiff even alleges to have been violated is section 229.63, but, as set forth above, there is no evidence of any locomotives being in non-compliance with that section. Because there is a lack of specific facts necessary to support his allegation, CSXT is entitled to summary judgment.

### C. Plaintiff cannot produce any evidence that he rode locomotives over defective track

As with Plaintiff's allegation of defective locomotives, his allegations of riding locomotives over defective track is based solely upon speculation.  He cannot identify where such track was located, when he rode over such track, or how such track was defective.  In order

to survive summary judgment, Plaintiff must "by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). There are no specific facts showing any issue for trial with respect to defective track; there is no evidence whatsoever of defective track, therefore, Plaintiff cannot meet his burden of proof.

## II.  PLAINTIFF'S CLAIMS ARE PRECLUDED BY SUPERCEDING FEDERAL LAW

### A.  The FRSA precludes Plaintiff's defective track and improper ballast size claims

The FRSA's purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000) (quoting 49 U.S.C. §20101). The FRSA authorizes the Secretary of Transportation ("Secretary") to "prescribe regulations and issue orders for every area of railroad safety." *Id.* (quoting 49 U.S.C. §20103(a)). Under the FRSA's express preemption provision, "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. §20106(a)(1). "A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. §20106(a)(2). A state-law negligence action is "covered" and therefore preempted if a FRSA regulation "substantially subsume[s]" the subject matter of the suit. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). The FRSA precludes FELA claims to the same extent the FRSA would preempt state law negligence claims. *Waymire v. Norfolk & Western Ry. Co.*, 218 F.3d 773, 777 (7th Cir. 2000); *Nickels v. Grand Trunk Western R.R., Inc.*, --- F.3d. ---, 2009 WL 691040 (6th Cir. 2009); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439 (5th Cir. 2001). As the Seventh Circuit observed, "[t]o treat cases brought under federal law differently from cases brought under state law would defeat FRSA's goal of uniformity." *Waymire* at 777. Thus, a

plaintiff can bring an action under the FELA unless the Secretary has prescribed a regulation or issued an order "covering the subject matter of the State requirement." 49 U.S.C. §20106.

Soon after passage of the FRSA, the FRA promulgated initial Track Safety Standards, which "prescribed initial minimum safety requirements for railroad track." 36 Fed. Reg. 20336, 20338. "[B]ased on the safety practices of the rail industry at that time, available track-related data, and public comments and testimony" (44 Fed. Reg. 52107), these initial standards were intended to operate as an evolving set of safety requirements that would "be continually reviewed and revised by the FRA in light of technical innovation, the results of the FRA research and development program, and [regulatory] experience." 36 Fed. Reg. 20336, 20336. In fact, the FRA has revised and expanded the Track Safety Standards several times since their initial promulgation. *See, e.g.,* 71 Fed. Reg. 59677 (Oct. 11, 2006); 66 Fed. Reg. 1894 (Jan. 10, 2001); 63 Fed. Reg. 33992 (June 22, 1998); 47 Fed. Reg. 39398 (Sept. 7, 1982). Divided into several interconnected subparts, the standards regulate, *inter alia*, train speed, track alignment, track elevation, cross-ties, drainage, and vegetation control. *See* 49 C.F.R. §§213.1–.369.

### 1. *Track safety standards cover the subject matter of ballast precluding plaintiff's choice of ballast claim.*

Ballast is one of the matters specifically regulated by the FRA. Ballast is the material used to support the track structure and provide drainage. It normally consists of crushed rock. Section 213.103 of the FRA's Track Safety Standards governs the minimum requirements for ballast. Ballast is considered "safe" under the Track Safety Standards if it transmits/distributes the load of trains, restrains the track, drains the track and "maintain[s] proper track crosslevel, surface and alinement" 49 C.F.R. §213.103.

The FRA does not require any particular size of ballast, but railroad ballast is generally divided into two gradations, often referred to as "yard" ballast and "mainline" ballast. At CSXT,

"yard" ballast is generally 3/8 of an inch to one inch, and "mainline" ballast is generally three quarters of an inch to two inches.   For good reason, the FRA ballast regulation does not require the use of a particular size of ballast.  Deciding which size of ballast is the most appropriate for a particular location—and the most likely to satisfy the functional requirements set forth in 49 C.F.R. §213.103 (as well as, for example, the interconnected cross-level, surface, and alignment requirements set forth in 49 C.F.R. §§213.55, 213.57, and 213.63)—is a complex process that must be undertaken with detailed knowledge of the local conditions.  Thus, the FRA has decided to leave the choice of ballast in a particular location to the railroad, which alone possesses the requisite local knowledge to ensure that the ballast selected will, under the given conditions, fulfill the functional requirements set forth, in exacting detail, in 49 C.F.R. §§213.33, 213.37, 213.55, 213.57, and 213.63.  Of course, the FRA conducts inspections to ensure compliance with these requirements.  *See* Federal Railroad Administration Track Safety Standards Compliance Manual (Apr. 1, 2007), available at http://www.fra.dot.gov/us/content/460.

Significantly, the ballast regulation was expressly reaffirmed by the FRA after a congressionally mandated safety review.  Congress—through the Rail Safety Enforcement and Review Act of 1992, Public L. 102-365, 106 Stat. 972 (1992), as amended by the Federal Railroad Safety Authorization Act of 1994, Public L. 103-440, 108 Stat. 4615 (1994)—ordered the FRA to review all of its "regulations related to track safety standards." 49 U.S.C. §20142(a). That review was specifically required to include, among other things, "employee safety."  49 U.S.C. §20142(a)(3).  At the conclusion of the mandatory review, the FRA was required to "revise track safety standards, considering safety information presented during the review."  49 U.S.C. §20142(b).  Pursuant to the congressional directive, the FRA convened a working group which—after having "systematically surveyed the existing regulations to identify those sections

and subsections that needed updating" (Track Safety Standards, 63 Fed. Reg. 33992, 33993 (June 22, 1998))—unanimously recommended that the FRA ballast regulation set forth in 49 C.F.R. §213.103 "remain as currently written." 63 Fed. Reg. at 34006. The FRA "agree[d] with the recommendation," adopted it as its own, and affirmatively decided to let 49 C.F.R. §213.103 stand unchanged. *Id.*

The FRA ballast regulation is just one part of "an integrated undertaking" that comprises "numerous elements." Policy Statement, 43 Fed. Reg. 10583, 10585 (March 14, 1978). Given their interdependence, "[a]s a general rule, it is not possible to regulate an individual hazard without impacting on other related working conditions, nor without impacting on the safe transportation of persons and property." Id. For that reason, "piecemeal regulation . . . would be disruptive and contrary to the public interest." *Id.* at 10586. It is, therefore, "essential that the safety of railroad operations be the responsibility of a single agency and that that agency undertake new initiatives in an informed and deliberate fashion, weighing the impact of particular proposals on long-standing industry practices and pre-existing regulations." *Id.* at 10585. The FRA is that agency. The FRA has "special competence" in "traditional areas of railroad operations" and has "developed a special expertise which makes [it] uniquely qualified to play the primary role in the Federal Government's efforts to assure safe employment for railroad employees engaged in activities related to railroad operations." *Id.*

Lest "piecemeal regulation" interfere with the agency's "integrated undertaking," in 1998 the FRA promulgated a regulation underscoring the preemptive effect of its track safety standards, which of course include the ballast regulation. *See* 49 C.F.R. §213.2 (reiterating that "[u]nder 49 U.S.C. 20106, issuance of these regulations preempts any State law, regulation, or order covering the same subject matter" except under certain narrowly defined circumstances).

Although the regulation merely restates the FRSA preemption provision, the FRA felt compelled to "provide[] a statement of agency intent" that "promotes national uniformity of regulation in accordance with the statute."  Track Safety Standards, 62 Fed. Reg. 36138, 36146 (July 3, 1997).

It is well established that FRA regulations issued under the FRSA preempt any state-law requirement with respect to the "subject matter" covered by the regulations, including any requirement imposed through common-law tort actions.  49 U.S.C. §20106(a)(2); *see also* 49 C.F.R. §213.2.  In this case, Plaintiff does not allege that CSXT violated the Track Safety Standards, but alleges that CSXT should have used a different size of ballast.  The FRA has, however, promulgated a regulation specifically governing the use of ballast as part of the agency's "integrated" track safety requirements.  43 Fed. Reg. at 10585.  Not only does the ballast regulation constitute an integral part of the agency's broader regulatory scheme, but the FRA expressly decided to leave the regulation unchanged after conducting a congressionally mandated review of the regulation's impact on employee safety.   *See* 63 Fed. Reg. at 34006. Given its content, history, and structure, the ballast regulation covers the subject of, and therefore precludes, Plaintiff's FELA claim.

CSXT recognizes that this Court has held to the contrary in previous cases, however, CSXT maintains such decisions were erroneous.  As an initial matter, they view the ballast regulation in isolation rather than as part of an "integrated undertaking" (43 Fed. Reg. at 10,585), thereby ignoring the Supreme Court's admonition that a given regulation must be considered in "the context of the overall structure of the regulations."  *Easterwood*, 507 U.S. at 674.  They also erroneously characterize the ballast regulation as being concerned with "the safety of the train, the prevention of derailments, and not the quality of the workplace provided for employees." *Grimes v. Norfolk Southern Railway Co.*, 116 F. Supp. 2d 995, 1003 (N.D. Ind. 2000); *Wilcox v.*

11

*CSX Trans., Inc.*, 2007 WL 1576708, 7 (N.D. Ind. 2007). That characterization is factually incorrect because the prevention of derailments is itself an important aspect of worker safety, and because the ballast regulation was expressly reaffirmed by the FRA after a congressionally mandated review that specifically considered employee safety. *See* 49 U.S.C. §20142(a)(3); 63 Fed. Reg. at 34,006. Moreover, even if the characterization regarding the regulation's purpose were accurate, it is legally irrelevant. As the Supreme Court held in *Easterwood*, 49 U.S.C. §20106(a)(2) "does not . . . call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter." 507 U.S. at 675; *see also Waymire*, 218 F.3d at 776 ("the preemption clause does not require an inspection of the regulation's motivation").

Furthermore, placing undue weight on the fact that the ballast regulation does not specify a particular size of ballast, the decisions that have denied preclusive effect to the regulation reach the potentially erroneous and in any event irrelevant conclusion that "a FELA cause of action . . . will not impose duties on a railroad that would be inconsistent with the duties imposed by the FRA safety regulations." *DeGrasse v. CSX Transp., Inc.*, No. 1:00-CV-55, at *8 (N.D. Ind. 2001). The conclusion is potentially erroneous because although ballast is not required to be a specific size, it is required to perform certain functions, the adequate performance of which, within narrowly defined tolerances, may well depend on its size. *See* 49 C.F.R. §213.103(d); *cf.* 49 C.F.R. §§213.55, 213.57, 213.63. Moreover, to the extent an FELA claim seeks to impose a duty on a railroad to use a specific size of ballast, it conflicts with the FRA regulations which allow the railroad to use its own discretion in making such a determination.

The conclusion is in any event irrelevant because the issue is not whether the common-law duty Plaintiff seeks to impose would conflict with the regulation, but rather whether the

regulation "covers" the subject matter of the claim.  If a conflict between the common-law duty and the FRA regulation were necessary for either preemption (or preclusion) under 49 U.S.C. §20106(a)(2), then the result in *Easterwood* would have been different.  In that case, the plaintiff alleged that a train had been traveling at a negligent speed notwithstanding the fact that it was operating within the FRA-imposed speed limit.  Because the train could have traveled at a lower speed without violating the FRA regulation, there was no "conflict" between the purported common-law duty and the FRA regulation.  Nonetheless, the Supreme Court held the claim to be preempted under the FRSA.  *See Easterwood*, 507 U.S. at 675; *see also Waymire*, 218 F.3d at 776 (holding FELA negligence claim based upon speed of train precluded notwithstanding fact that applicable FRA regulation imposed maximum, not minimum, speed).  Thus, the decisions that conclude that ballast claims brought under FELA are not precluded because there (allegedly) is no conflict between the common-law duty asserted and the FRA ballast regulation are contrary to Supreme Court precedent.

Since this Court's decision in *Wilcox*, many courts, including the Sixth Circuit, have concluded that the FRA ballast regulation covers the subject of—and therefore precludes— ballast claims such as Plaintiff's.  *Nickels v. Grand Trunk Western R.R., Inc.*,  --- F.3d. ---, 2009 WL 691040 (6th Cir. 2009), *Munns v. CSX Transp., Inc.*,  2009 WL 805133, 3 (N.D. Ohio 2009); *Ferra v. Canadian National*, Case No. 05-72721, (E.D. Mich. May 4, 2007); *Crabbe v. Consolidated Rail Corp.*, 2007 WL 3227584 (E.D. Mich. 2007). In each such case, the plaintiff brought an FELA claim against his employer railroad for injuries he allegedly sustained from walking on mainline railroad ballast, contending the railroad should have chosen a different type of ballast.  The defendant railroad in each case, like the defendant here, moved for summary judgment on the basis that the FRSA precludes an FELA claim regarding the railroad's choice of

ballast because the FRSA's regulations cover the subject matter of ballast and allowing such a claim would undermine the FRSA's stated goal of national uniformity.

The ballast requirements substantially subsume the subject matter of Plaintiff's theory of recovery. While the regulations offer no specific metric for the size, mixture or looseness of the ballast, they do ordain particular purposes that the ballast must serve. As a consequence, the regulations mandate a limited universe of material that is suitable for the listed purposes. In the same way that federal speed regulations set uniform national ceilings that a FELA claim of negligence cannot alter, *see Waymire*, 218 F.3d 773; *Lane*, 241 F.3d 439, the ballast regulations set a base level that a FELA claim may not augment. *See also Norfolk & Western Ry. Co. v. Public Utilities Com'n of Ohio*, 926 F.2d 567, 571-72 (6th Cir. 1991) (holding that the FRSA's explicit refusal to adopt a regulation requiring bridge walkways amounted to a negative preemption of Ohio regulation concerning walkways on railway bridges and trestles). The purpose of a uniform national standard would be disregarded and its practical effect lost if individual FELA claims could create a hodgepodge of differing standards in disparate locales, each such "standard" being attuned by the verdict of a separate jury to the peculiar circumstances of one railroad worker's physical characteristics and his reaction to the otherwise-compliant ballast found at that locale.

### 2. *Track safety standards cover the subject matter of track maintenance precluding plaintiff's defective track claim.*

The Track Safety Standards cover track maintenance, inspection and repair. *Munns* at 3. Because the Track Safety Standards cover the subject matter of Plaintiff's FELA claim as it pertains to track issues, the claim is precluded unless Plaintiff can establish that CSXT failed to comply with the Track Safety Standards. *See* 49 U.S.C. §20106(b). Plaintiff cannot, however,

identify any specific track defects in this case, nor does he have any evidence of violations of the Track Safety Standards.  Accordingly, Plaintiff's claim is precluded.

### B. The LIA Precludes Plaintiff's FELA Claim Regarding Locomotive Design And Equipment

Plaintiff's claim that the locomotives should have been equipped with different types of seats, or seats with different design qualities is precluded by the LIA.  The LIA occupies the field of locomotive design and equipment and sets forth the standards for when a locomotive is fit for service.  Therefore, an action that seeks to impose a duty on the railroad to install additional or different equipment on locomotives that is not required by the LIA is precluded.

### 1.  Sources Of Federal Preemption Or Preclusion In Railroad Cases

There are generally three primary sources of preemption or preclusion in railroad cases. The first is the Federal Rail Safety Act of 1970 (FRSA), 49 U.S.C. §20106 (formerly 45 U.S.C. §434).  The second is the Federal Locomotive Inspection Act (formerly the Boiler Inspection Act), 49 U.S.C. §20701, et seq. (formerly 45 U.S.C. §23, et seq.). The third is the Safety Appliance Act. 49 U.S.C. §20301, et seq. (formerly 45 U.S.C. §1, et seq.).

It is important to note that there are different "triggers," or requirements, under the different federal statutes before federal preemption or preclusion occurs that should not be confused.  For instance, as set forth above, under the terms of the FRSA, federal preemption or preclusion occurs when the Secretary promulgates a regulation or issues an order "covering the subject matter" of the asserted state law.    In such cases, the issue is whether the FRSA regulation "covers the subject matter" of the plaintiff's FELA claim.  If so, then the FELA is precluded by federal law.

A different analysis is required for cases involving the Locomotive Inspection and Safety Appliance Acts.  Under the Locomotive Inspection and Safety Appliance Acts, preemption or

preclusion occurred at the time of the enactment of those statutes by virtue of their "occupying the field." Where Congress intends to "occupy a field," a competing law in that field is preempted. *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 212-213 (1983). When a federal statute "occupies the field" of a particular area of law, the preclusive effect is much broader. In such cases, the issue is not whether the federal statute has covered the subject matter of the claim. Instead, a competing federal or state law claim is preempted or precluded irrespective of whether such claim is conflicting or complementary of the competing federal law, and irrespective of whether the Secretary has issued a regulation or order covering the subject matter. Where the federal government has occupied a field, "the test of preemption is whether 'the matter on which the State asserts the right to act is in any way regulated by the Federal Act.'" Pacific Gas & Electric, 461 U.S. at 212- 213 (citations omitted).

## 2. The LIA Occupies The Field Of Locomotive Equipment And Design Preempting State Law Claims

It is undeniable that the LIA occupies the field of locomotive design and equipment and sets forth the standards for when a locomotive is fit for service, preempting state-law claims which seek to impose a duty on the railroad to install additional or different equipment on locomotives that is not required by the LIA. The LIA sets forth uniform requirements for locomotives and gives the Secretary of Transportation broad authority to set compliance standards by prescribing rules and regulations for determining fitness of locomotives and their parts and appurtenances. 49 U.S.C. §20702(a). Congress' intent in passing the LIA was to occupy the entire field of regulating locomotive equipment, preempting state-law claims. *Napier v. Atlantic Coast Line R.R.*, 272 U.S. 605, 613 (1926).

16

The LIA's preemption extends to the "design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." *Id.* Consequently, a state may not impose liability on a railroad for failure to install locomotive equipment if it is "within the scope of the authority of the [Secretary]" to prescribe the same equipment, even if the Secretary has not already prescribed a rule or made any other requirement inconsistent with the state legislation. *Id.* at 611, 613. The Secretary of Transportation, through the Federal Railroad Administration, "'sets the standard' by which a locomotive's 'fitness for service shall be determined.'" *Norfolk Southern Railway Company v. Denson*, 774 So. 2d 549, 554 (Ala. 2000), quoting *Napier* at 612.

In *Napier*, the railroad sought to enjoin enforcement of a Georgia statute requiring locomotives to have automatic fire box doors, and a Wisconsin statute requiring locomotive cabs to be equipped with a cab curtain. The United States Supreme Court concluded that the BIA (now the LIA) gave the ICC (now the Secretary of Transportation) full authority over "the design, the construction and the material of every part of the locomotive and tender and of all the appurtenances." Although the LIA had not issued any regulations regarding automatic fire box doors or cab curtains, the Court held that the laws were preempted under the LIA, noting that the "fact that the commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power" and holding that "state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field." *Id.* at 613.[2]

---

[2] The United States Courts of Appeals for the Second, Fifth, Sixth, and Ninth Circuits have all recognized the LIA's broad preemptive scope. *See United Transp. Union v. Foster*, 205 F.3d 851, 860 (5th Cir. 2000) ("In short, the [LIA] completely preempts the field of locomotive equipment."); *Oglesby v. Delaware & Hudson Railway Co.*, 180 F.3d 458, 462 (2nd Cir. 1999) (state common law action against railroad manufacturer preempted by LIA); *Springston v. Consolidated Rail Corp.*, 130 F.3d 241, 245 (6th Cir. 1997) (claim that railroad was negligent for failing to install different warning equipment on the locomotive and operating a "defective" locomotive preempted by the LIA.); *Law v. General Motors Corp.*, 114 F.3d 908, 911 (9th Cir.1997) ("The [LIA] preempts any state action that would affect the design, the construction, and the material of locomotives."); *Missouri Pac. R.R. Co. v. Railroad Comm'n*

### 3.  *The LIA's Preemptive Effect Extends To FELA Claims*

The LIA's preemptive effect extends to FELA claims which seek to impose a duty on the railroad to install additional or different equipment on locomotives that is not required by the LIA because allowing such FELA claims to proceed would undermine Congress's goal of nationally uniform federal regulations.  A plaintiff can bring a claim for a railroad's failure to maintain equipment mandated by the LIA or failure to otherwise comply with the LIA.  However, when the railroad is in compliance with all applicable federal regulations, the plaintiff cannot impose a duty upon the railroad to install different or additional equipment on locomotives under either the LIA or the FELA generally.

In *Denson*, two train crew members were involved in a collision with a truck and were injured by flames entering the cab.  They brought an action under the FELA alleging that the railroad failed to provide them a safe place to work by providing them with a locomotive that was not air conditioned.  The Court held that federal regulations preclude FELA claims to the same extent federal law would preclude state law claims as such FELA cases "involve policy considerations that closely parallel those involved in preemption cases," noting:

> It is essentially undisputed that if these claims were based on state law, they would be preempted by the FLIA and the FRSA. The plaintiffs remind us that this is an action based on federal-not state-law. Thus, they contend, the doctrine of preemption is inapposite. We disagree with that contention. The practical effect of such a rule would be identical whether the rule is based on a state statute or on this Court's interpretation of federal law. Indeed, the need for uniformity, which is one of the bases of preemption, has been addressed by the Federal Railroad Administrator ("the Administrator") in a context analogous to the one before us.

*Id.* at 555.

---

*of Texas*, 833 F.2d 570, 576 n. 7 (5th Cir.1987) ("State attempts to prescribe any locomotive safety equipment must necessarily fail.").

The Court also explained that LIA preclusion of FELA claims is necessary to preserve Congress's stated goal of nationally uniform federal standards:

> We know of no case holding-as the plaintiffs urge us to do-that the FELA simply requires railroads to air condition their locomotives. Thus, were this Court to hold that the FELA carries such a requirement, the uniformity that is jealously guarded by the FRA, and on which various federal policies are grounded, would be destroyed. Under such a construction of the FELA, locomotives operating in Alabama would have to be air conditioned, while those operating in neighboring states would not. The territorial conflict created by judicial caprice would constitute the "piecemeal regulation of individual hazards" of the sort eschewed by the FRA. 43 Fed.Reg. at 10586.

*Id.* at 566.

Several more recent FELA cases have also rejected the notion that an FELA plaintiff may circumvent the LIA by attempting to impose a duty upon the railroads to install different or additional equipment on locomotives. In *Kansas City Southern Ry. Co. v. Nichols Const. Co.*, L.L.C., --- F.Supp.2d ----, 2008 WL 3850547 (E.D. La. August 13, 2008), two members of a train crew involved in a collision with a truck brought an FELA action against the railroad alleging, among other things, that the railroad was negligent under the FELA for failing to equip the locomotives with seat belts, "proper" padding on the interior of the cars, and "proper" seats. The Court defined the question before it as whether such an FELA claim was precluded when "relevant sections of the Code of Federal Regulations are completely silent as to seat belts and padding." The Court answered the question in the affirmative holding that "because 49 C.F.R. §229.119(a) seems to be the federal code's only statement about train seat safety, regardless of the variable circumstances in which even securely mounted and braced seats could be unsafe, . . . a railroad's compliance with §229.119(a) precludes a question of its negligently failing to equip cab seats with additional safety features, such as seat belts." *Id.* at 8. As other courts have done,

the Court emphasized the effect allowing such claims to proceed would have on Congress's goal of nationally uniform federal regulations:

> If the Court were to hold that a question exists as to KCS's negligent failure to equip its trains with seat belts and other safety devices specifically not required by regulations with which KCS is otherwise in full compliance, it would impose a duty on KCS to diverge from federally mandated safety requirements that are intended to provide national uniformity in all areas of railroad safety. Any such imposition must come about through statutory revision, not the through Court's interpretation and application of federal law. Accordingly, KCS's compliance with the FRSA and 49 C.F.R. §229.119(a) sufficiently precludes Plaintiffs' negligence claim as to additional safety devices and KCS is entitled to judgment as a matter of law.

*Id.* at 8 (emphasis added.)

In *Tucker v. BNSF Ry. Co.*, 2008 WL 3286748 (E.D. Cal. August 6, 2008), the plaintiff, a locomotive engineer, was injured in a collision between his train and a truck. He brought an FELA claim against the railroad contending that the failure to provide seatbelts and padding rendered the locomotive cab insufficiently safe under the FELA. In granting summary judgment, the Court found that the railroad was not liable under the LIA for failing to install such additional equipment on its locomotive. The Court also went further, after noting that "to preserve national uniformity, compliance with FRA regulations precludes a claim under FELA," and held that the railroad "did not violate its broad duty to maintain the safety of the cab by failing to install seatbelts or padding." *Id.* at 2.

In *Dodge v. Union Pacific R.R. Co.*, 2007 WL 1432033, (D. Or. 2007), a railroad conductor who injured himself exiting a locomotive cab alleged that the railroad was negligent under the FELA in failing to provide sufficient lighting and for failing to post a sign warning that there were steps outside the cab's rear door. Although the Court denied summary judgment on

other grounds, the Court disagreed with the plaintiff's assertion that he could maintain an FELA

claim for failure to install additional safety features on a locomotive, noting:

> To permit a jury to impose upon a railroad the duty to equip its
> locomotive with purported safety features that the FRA has not
> seen fit to impose undermines the LIA's goal of national
> uniformity and the authority of the uniquely qualified FRA to
> assert its expertise regarding such features.

*Id.* at 3, fn. 2.

In *Dickerson v. Staten Trucking, Inc.*, 428 F. Supp. 2d 909, 913 (E.D. Ark. 2006), the

plaintiff, a railroad engineer, claimed the railroad was negligent under the FELA for failing to

install certain equipment or devices on its locomotive, such as "physical restraints and safety

belts," and interior cushioning. The Court granted summary judgment of the plaintiff's FELA

claim, finding that the railroad complied with applicable federal regulations and "there is nothing

in the record to support the conclusion that safety restraints or locomotive floor padding are

components essential to the locomotive's operation."

In *Key v. Norfolk Southern Ry. Co.*, 491 S.E.2d 511 (Ga. App. 1997), the plaintiff, a

locomotive engineer, was injured while descending locomotive steps and brought an FELA

action against the railroad for "defective design" of the steps. Noting that the steps complied

with the LIA, the court found that the LIA preempted (precluded) the plaintiff's FELA claim,

noting the effect of such claim would undermine Congress's goal of nationally uniform federal

regulations:

> Allowing a jury to agree with Key's expert, find the railroad
> negligently designed the steps, and award damages accordingly
> would, in effect, result in state or common-law regulation. Such
> "regulation can be as effectively exerted through an award of
> damages as through some form of preventive relief. The obligation
> to pay compensation can be, indeed is designed to be, a potent
> method of governing conduct and controlling policy." (Citation
> and punctuation omitted.) *Cipollone v. Liggett Group*, 505 U.S.

> 504, 521, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992). As a
> federal appeals court held in *Law v. Gen. Motors Corp.*, 114 F.3d
> 908, 910-911 (9th Cir.1997), to allow various state juries to
> second-guess the actions of an interstate railroad which has
> complied with federally-mandated design standards would
> undermine "Congress's goal of uniform, federal railroad
> regulation[.]"

*Id.* at 513-514.

As set forth in the above-cited cases, the LIA occupies the field of locomotive equipment

and design so that a plaintiff cannot dictate to the railroads through an FELA claim what

equipment must be installed on a locomotive or when a locomotive is fit for service.

### 4. *Any Claim By Plaintiff That CSXT Was Negligent Under The FELA For Failure To Install Additional Or Different Seats Or Equipment Is Precluded By The LIA*

In this case, Plaintiff claims CSXT had a duty under the FELA to equip its locomotives

with different seats, such as air-suspension seats, or seats with different design qualities.  The

LIA, however, occupies the field of locomotive design and equipment and sets forth the

standards for when a locomotive is fit for service.  Plaintiff cannot do an end-run around the LIA

by using an FELA lawsuit to dictate to the railroads what equipment it must install on a

locomotive so that it is fit for service.  To the extent that plaintiff intends to argues that CSXT

was required under the FELA to install different seats or seats with different design qualities, his

claim is precluded by the LIA.   *Munns* at 5 ("LIA preempts plaintiff's FELA claim as to design

defects, including his contentions about ergonomic unsuitability, regarding the seats on which he

rode.")

Were this Court to hold that a plaintiff through the FELA can require a railroad to install

different or additional equipment on a locomotive, "the uniformity that is jealously guarded by

the FRA, and on which various federal policies are grounded, would be destroyed." *Denson* at

566.  Under such a construction of the FELA, locomotives operating in one jurisdiction might have to have seats with certain design characteristics, while those operating in neighboring states would not. For instance, an FELA plaintiff in one jurisdiction could claim a locomotive should have air-cushioned seats to soften his ride, while an FELA plaintiff in another jurisdiction could claim air-cushioned seats are too soft creating too bouncy of a ride.  If both lawsuits would be successful, a railroad would be in the untenable position of having one jurisdiction requiring it to use one type of seat, while another jurisdiction requiring it to use a different seat.  If, in FELA lawsuits, different jurisdictions were to require seats and locomotive equipment which are not federally mandated, the result would be varying standards from jurisdiction to jurisdiction.  "The territorial conflict created by judicial caprice would constitute the 'piecemeal regulation of individual hazards" of the sort eschewed by the FRA.'"  *Denson* at 566.

Were this Court to allow Plaintiff to mandate the use of certain types of non-required locomotive seats or equipment through an FELA lawsuit,  it "would impose a duty on [CSXT] to diverge from federally mandated safety requirements that are intended to provide national uniformity in all areas of railroad safety. Any such imposition must come about through statutory revision, not the through Court's interpretation and application of federal law." *Kansas City Southern Ry. Co. v. Nichols Const. Co., L.L.C.*, at 8.

Because the LIA occupies the field of locomotive equipment and design, and because the Secretary of Transportation alone can dictate when a locomotive is fit for service, any claim by Plaintiff that CSXT had a duty to install different or additional locomotive seats or equipment is precluded by the LIA.

### III. CSXT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE REGARDING THE CAUSE OF PLAINTIFF'S ALLEGED INJURIES

Even if Plaintiff had provided evidence of negligence, that alone would not entitle him to continue with this lawsuit. A plaintiff must also prove "'that such negligence was the proximate cause in whole or in part' of the injury." *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 32 (1944) (citations omitted.) "The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause, and the case must be withdrawn from its consideration, unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer." *Atchison, T. & S. F. Ry. Co. v. Toops*, 281 U.S. 351, 354-355 (1930) . There is no such evidence.

#### A. There is no evidence that Plaintiff's back condition was caused by any alleged negligence

Plaintiff has been diagnosed with degenerative disc disease. He contends that his condition was caused by riding on "defective" locomotives over "defective" track. There is no evidence to support that contention. Plaintiff's treating physician for that condition is Dr. Robert Shugart. Dr. Shugart testified that he cannot give an opinion regarding the cause of Plaintiff's condition, that he was not looking for the cause nor did he make any determination of the cause during his treatment of Plaintiff, that but was instead looking at treatment, and, consequently, cannot give any opinions regarding causation either generally or specifically. (Shugart Dep. at 16-18.) There is no evidence that any alleged negligence caused Plaintiff's degenerative disc disease. Absent evidence of causation, Plaintiff has failed to support an essential element of his FELA claim. Accordingly, CSXT is entitled to summary judgment.

### B. There is no evidence that Plaintiff's knee osteoarthritis was caused by any alleged negligence

Plaintiff also was diagnosed with osteoarthritis of the right knee and underwent a total knee replacement.  He contends that condition was caused by walking on the wrong size of ballast.  There is no evidence to support the contention that Plaintiff's knee osteoarthritis was caused by walking on one size of rocks rather than another.   Plaintiff's treating physician for this condition is Dr. Gregory Sassmannshausen.  Dr. Sassmannshausen testified that it was not his role to determine the cause of Plaintiff's osteoarthritis: "I don't know if my role is to figure out the cause for osteoarthritis.   My--my goal is to try to get the patient improved." (Sassmannshausen Dep. at 18.)  Dr. Sassmannshausen further testified that he could not state the "exact cause" of Plaintiff's osteoarthritis.  (Sassmannshausen Dep. at 43.)  Dr. Sassmannshausen did testify that he believed a prior motorcycle accident and "repetitive" work activities "contributed" to the condition, but defined "contributed" as merely "a potential source." (Sassmannshausen Dep. at 43.)  Moreover, he defined "repetitive" work as getting on and off trains, not walking on "large, oversized ballast" as alleged by Plaintiff.

Therefore, at best, Dr. Sassmannshausen could not testify to the cause of Plaintiff's condition, but could only testify that getting on and off trains over the years was a "potential source" of Plaintiff's condition.   Regardless, he did not testify that CSXT's alleged use of "large, oversized ballast" contributed in any way to Plaintiff's condition, which is the issue in this case.   There is no such evidence.   Absent evidence of causation, Plaintiff has failed to support an essential element of his FELA claim.   Accordingly, CSXT is entitled to summary judgment.

WHEREFORE, CSX Transportation, Inc. respectfully requests that this Court grant summary judgment in this matter.

Respectfully submitted,

ANSPACH MEEKS ELLENBERGER LLP

s/James R. Carnes
James R. Carnes (0070005)
300 Madison Ave., Suite 1600
Toledo, OH  43604-2633
Tel.:  (419) 246-5757
Fax:  (419) 321-6979
jcarnes@anspachlaw.com

Attorneys for Defendant,
CSX Transportation, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2009, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

ANSPACH MEEKS ELLENBERGER LLP

<u>s/James R. Carnes</u>
James R. Carnes (0070005)
300 Madison Ave., Suite 1600
Toledo, OH  43604-2633
Tel.:  (419) 246-5757
Fax:  (419) 321-6979
jcarnes@anspachlaw.com

Attorneys for Defendant,
CSX Transportation, Inc.